IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Abigail L. Memis,                        )
                                         )    Civil Action No. 2:11-1084-CWH-BHH
                    Plaintiff,           )
                                         )
        vs.                              )
                                         )    **REPORT AND RECOMMENDATION**
                                         )    **OF MAGISTRATE JUDGE**
                                         )
City of North Charleston,                )
                                         )
                    Defendant.           )
_____)

        This matter is before the Court on the defendant's motion for summary judgment
[Doc. 30] pursuant to Federal Rule of Civil Procedure 56.   The plaintiff brought this case
alleging that she was subjected to a hostile work environment and discriminatory treatment,
on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.
2000e *et seq.*  She has also pled a claim for retaliation.

        Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and
Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases
are referred to a United States Magistrate Judge for consideration.

## FACTUAL BACKGROUND

        The plaintiff was hired by the defendant as a firefighter, on or about February 5, 2007.
During her employment with the defendant, the plaintiff was originally assigned to Fire
Station 5 – B Shift.  At the time her employment with the defendant ended, on May 17, 2010,
the plaintiff was employed as a Firefighter assigned to the defendant's Fire Station 6 – B
Shift.  She was the only female on her shift at either station.  (Pl. Dep. at 19-20; 41; 242.)
Before beginning work at Station 5, the plaintiff was warned that she was going to have a
hard time because the guys at Station 5 did not want her there. (Pl. Dep. at 26.)

        Sam Gadson, who worked with the plaintiff at Station 5 and later supervised the
plaintiff, at Station 6, is alleged to have not liked female firefighters, did not like to work with

women, and thought women could not perform a firefighter's job. (Mishoe Dep. at 66.) Gadson also allegedly called women firefighters "worthless" and a "waste of air." *Id.* at 65.

As will be described in more detail below, the plaintiff alleges that, in fact, she did experience significant gender related harassment during her time in Station 5. (Pl. Dep. at 47, 57, 59-65, 74-75 83, 88, 92, 95, 139, 148-49, 214, 267-68.) The plaintiff kept a notebook of the alleged grievances and eventually requested a transfer from Battalion Chief Forner. (Pl. Dep. at 383-87.) Apparently, in an embarrassing fashion, Forner shared the notebook with the rest of the station. *Id.* at 75, 130-33.

On or about January 14, 2009, the plaintiff was transferred to Station 6. On June 20, 2009, the plaintiff suffered a knee injury while assigned to Station 6 and working at a fire scene. (Pl. Dep. at 218-19.) As a result, the plaintiff was placed in a light-duty status and assigned to the fire department's headquarters. *Id.* She was not subjected to any harassment during this time. (Pl. Dep. at 219-20.) While assigned to fire department headquarters, Gadson was transferred to Station 6, as a supervisor. *Id.* at 230. The plaintiff claims she asked then Battalion Chief Bud Green not to send her back to Station 6, as a result. *Id.* at 230-33. But the plaintiff was returned to Station 6 and, on January 27, 2010, the day the plaintiff was scheduled to return, she was disciplined for allegedly "making false statements" about a doctor's appointment. (Def. Ex. H.)

Subsequent to her return from suspension, the plaintiff contends that she was again subjected to a hostile work environment. (Pl. Dep. at 242-43, 246, 259-61, 267.) In all this time, the plaintiff also contends that she was denied necessary Class E training and certification, until April 16, 2010. (Pl. Dep. at 416.) Even on that day, when she was finally given the training, it was implied that, if she had simply performed a certain sexual favor, the opportunity for training would have come sooner. *Id.*

2

On May 3, 2010, the plaintiff, along with other members of the defendant fire department and other local agencies, began a two week hazardous materials training course at Station 4.  On or about Friday, May 7, 2010, the defendant received a report from other firefighters attending the course that the plaintiff was engaging in inappropriate conduct during the training course.  (Def. Ex. J.)  Assistant Fire Chief Kyle Minick investigated the situation and eventually made report to Fire Chief, Gregory Bulanow concerning the plaintiff's behavior.  (See Def. Ex. J.)

Chief Bulanow, after reviewing the  report and related statements, determined that the most appropriate action was to end the plaintiff's employment.  (Bulanow Dep. at 29.)  On Monday, May 17, 2010, Chief Bulanow met with the plaintiff, notified her of her discharge, and gave her a written explanation of the reasons for the action.  (Pl. Dep. at 329-33.)

The plaintiff submitted an Employment Initial Inquiry Questionnaire to the South Carolina Human Affairs Commission ("SCHAC") on or about September 9, 2010, and, thereafter, filed a Charge of Discrimination ("Charge") with the SCHAC, on or about October 11, 2010.  (Def. Ex. O.)

## APPLICABLE LAW

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information,

3

affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

**DISCUSSION**

**I.     Hostile Work Environment**

The plaintiff first alleges she was subjected to a hostile work environment on the basis of her gender. Title VII makes it unlawful for an employer "to discriminate against any individual . . . with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color . . . ." 42 U.S.C. § 2000e-2(a)(1). Since the environment of the workplace is a term or condition of employment, Title VII creates a hostile working environment cause of action. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986); *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).

To state a claim for hostile work environment, the plaintiff must show that: (1) the harassment was unwelcome; (2) the harassment was based on her gender; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003); *R & R Ventures*, 244 F.3d at 338; *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir.1997). The defendant contends that the plaintiff cannot establish either the third element of her claim.

The defendant first contends that the plaintiff cannot use, as a predicate to her hostile work environment claim, any incidents that occurred before December 15, 2009, 300 days prior to the EEOC Charge, filed on October 11, 2010. (Def. Ex. O.) As is well understood, South Carolina is a deferral state and, therefore, the plaintiff had 300 days from the alleged discriminatory act(s) to file a charge of discrimination with the South Carolina Human Affairs Commission (SCHAC) and/or the Equal Employment Opportunity Commission (EEOC). *See* 42 U.S.C. 2000e (2000); 29 C.F.R. 1601.13(a)(4)(ii)(2006). The plaintiff, however, contends that the "continuing violation" doctrine saves incidents of harassment prior to that date.

5

The United States Supreme Court has made fairly clear the operation of the doctrine. Title VII itself provides that a charge must be filed within 180 or 300 days "after the alleged unlawful employment practice occurred." *Id.* The Supreme Court has emphasized that a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116-17 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)). The Court stated further:

> The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.*

That act need not, however, be the last act. *Id.* As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. *Id.* Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole. *Id.*

Citing to the appellate court below, the Supreme Court affirmed consideration of "the pre- and post-limitations period incidents [which] involve [d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.* at 120-21. The Fourth Circuit has acknowledged the Supreme Court's view, apparently without modification or distinction. *See Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 140 (4th Cir. 2007).

The plaintiff contends[1] that, prior to December 15, 2009, the following actions created a hostile work environment on account of her sex:

---

[1]The defendnat challenges certain affidavits of the plaintiff. (See Def. Reply.) The Court would not make any specific ruling but does not believe that it has made citation to any controverted portion of them.

1.    The defendant's employees watched pornographic movies in the lobby of Station 5 and made crude comments about women while watching the movies (Pl. Dep. at 88-92; 95; Pl. Ex. 7 at 37:15-16);

2.    One of the plaintiff's supervisors, Sam Gadson, gave his penis a crude nickname and referred to it in the presence of the plaintiff (Pl. Dep. at 95-97);

3.    The defendant's employees made crude comments about women while looking at internet content (Pl. Dep. at 96-98);

4.    The defendant's employees used binoculars to look at women passing by the fire station and made crude and sexual comments about the women (Pl. Dep. at 92-93; Pl. Ex. 7 at 36);

5.    One of the plaintiff's supervisors, Sam Gadson, attempted to touch and/or grab the plaintiff's crotch after questioning whether she was a male or a female and she was referred to as a "Bahama bull bitch" (Pl. Dep. at 148-149);

6.    The defendant's employees asked the plaintiff if her pants were tight enough (Pl. Dep. at 27-30);

7.    The defendant's employees whispered about the plaintiff and tried to guess her bra size (Pl. Dep. at 27-30);

8.    The defendant's employees placed clear plastic wrap under a toilet seat in the bathroom so the plaintiff would urinate on herself (Pl. Dep. at 99);

9.    The defendant's employees called and/or referred to the plaintiff as a "bitch" (Pl. Dep. at 47; 57-59; 60-65; 139; 267-268);

10.   The defendant's employees called and/or referred to the plaintiff as a dumb ass by using the nickname "dimis" (which rhymes with the plaintiff's last name, Memis) (Pl. Dep. at 47; 57-65; 139; 267-68; Pl. Ex. 7 at 46);

11.   The defendant's employees required the plaintiff to wash their dirty kitchen dishes after meals, do all of the general cleaning at Station 5, and would use the bathrooms immediately after she had cleaned them and then require her to reclean them (Pl. Dep. at 46; 63; 83; 85-86; 138; 143);

12.   The defendant's employees called the plaintiff a maid (Pl. Ex. 7 at 35);

13.   The defendant's employees created and gave the plaintiff a form to sign acknowledging proposed job responsibilities, including the requirement to continue to do all of the cleaning at Station 5 (Pl. Dep. at 86);

14.  The defendant's employees accused the plaintiff of eating their food (Pl. Dep. at 83; Pl. Ex. 7 at 30);

15.  The defendant's employees excluded the plaintiff by buying food for every employee of the station except for the plaintiff (Pl. Dep. at 83);

16.  The defendant's employees excluded the plaintiff by ignoring and isolating her (Pl. Dep. at 83-84);

17.  The defendant's employees placed firecrackers by the plaintiff's ears (Pl. Dep. at 144-45);

18.  The defendant's employees yelled at the plaintiff (Pl. Dep. at 289; 259-61);

19.  The defendant's employees threatened that the plaintiff's working environment would become increasingly hostile if the plaintiff complained or transferred (Pl. Dep. at 198-200);

20.  The defendant's employees excluded the plaintiff by refusing to let the plaintiff train for or qualify for her Class E driver's license (Pl. Dep. at 269; 414-16); and

21.  The defendant's employees placed bets on which male employees would sleep with which female recruits during orientation classes (Pl. Dep. at 418-21).

The plaintiff contends that, after December 15, 2009, the following acts contributed to the previously created and ongoing hostile work environment:

1.  One of the defendant's employees told the plaintiff, "you know, if you had just sucked their d----, this would have been a whole lot easier and you would have already been driving" (referring to the previous and continued refusal of the defendant's employees to allow Plaintiff to train for and qualify for her Class E certification) (Pl. Dep. at 416);

2.  Th defendant's employees moved the plaintiff's sleeping quarters from a private room to the community firefighters' quarters while she was out of the station recovering from a job-related injury and gave her private room to a male (Pl. Dep. at 246; 249-253; Pl. Ex. 7 at 126-27);

3.  The defendant's employees made comments insinuating that the plaintiff and male firefighters engaged in sexual activity in the community firefighters' quarters during overnight shifts (Pl. Dep. at 246; 249-53);

4.  The plaintiff was required to do all of the general cleaning at Station 6 and wash the other employees' dishes (Pl. Dep. at 46; 63; 83; 85-86; 138; 143);

5.    The plaintiff's supervisor, Sam Gadson, yelled at the plaintiff about her attire in the station, but never yelled at male employees for similar attire (Pl. Dep. at 259-261);

6.    Gadson never gave the plaintiff a written warning for the incident involving her attire, but he documented it in the plaintiff's file as two separate reprimands (violating a direct order and a uniform violation) which were later used as reasons for her termination (Pl. Ex. 10; Pl. Ex. 4 at 41);

7.    The defendant's employees harassed the plaintiff regarding the cleaning duties around the station (Pl. Dep. at 46; 63; 83; 85-86; 138; 143);

8.    One of the defendant's employees told the plaintiff he put his "butt" on the beds in the community firefighters' quarters "so [plaintiff would] smell ass all night long" (Pl. Dep. at 246); and

9.    One of the defendant's employees asked the plaintiff if the plaintiff would go out with him (Pl. Dep. at 416).

The defendant first contends that there was a twelve month cessation of any alleged improper or inappropriate actions that necessarily broke the connection between the alleged actions that occurred prior to January 14, 2009, and those the plaintiff alleges occurred after December 15, 2009, the start of the 300-day limitations period.  The defendant contends, therefore, that no "continuing" violation can be found.

Specifically, on or about January 14, 2009, the plaintiff was transferred from Station 5 to Station 6.  Between her transfer to Station 6 and June 19, 2009, the plaintiff denies she was harassed.  (Pl. Dep at 217, 220-21.)  On June 20, 2009, while still assigned to Sation 5, the plaintiff suffered a knee injury in the line of duty.  (Pl. Dep. at 218-19.)  As a result, the plaintiff was placed in a light-duty status and assigned to the fire department's headquarters.  *Id.*  The plaintiff agrees that she was not subjected to a hostile work environment during her assignment to the fire department headquarters, between June 20, 2009, and January 26, 2010.  (Pl. Dep. at 219-20.)  Accordingly, the defendant argues that the plaintiff's admission breaks any relation between pre- and post-December 15, 2009 incidents.

While assigned to fire department headquarters, however, the plaintiff became aware that, then Engineer, Sam Gadson, was being transferred to Station 6.  (Pl. Dep. at 230.)

Because the plaintiff believed Gadson engaged in actions contributing to the hostile work environment at Station 5, the plaintiff asked then Battalion Chief Bud Green not to send her back to Station 6.  (Pl. Dep. at 230-33.)  But, she, in fact, was returned to duty at Station 6 on January 27, 2010.  The defendant would emphasize, however, that the plaintiff never told Green that Gadson, or any other firefighter, engaged in specific inappropriate conduct while she was assigned to Station 5.  (Pl. Dep. at 232.)

The United States Supreme Court anticipated this precise argument:

> The following scenarios illustrate our point: (1) Acts on days 1–400 create a hostile work environment. The employee files the charge on day 401. Can the employee recover for that part of the hostile work environment that occurred in the first 100 days? (2) Acts contribute to a hostile environment on days 1–100 and on day 401, but there are no acts between days 101–400. Can the act occurring on day 401 pull the other acts in for the purposes of liability? In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and **it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened**; on day 401 all incidents are still part of the same claim. On the other hand, if an act on day 401 had no relation to the acts between days 1–100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.

*Morgan,* 536 U.S. at 118.  The defendant would contend that in her transfer to Station 6 there was some intervening act.  But, the entire series of events was reassociated when one of the same offenders in the pre-December 15 conduct, Gadson, was again made her supervisor at Station 6 and after December 15, 2009.

The Court need not be graphic.  But, even a simple review of the pre- and post-December 15 lists seems to easily prove the connection between them.  In both, she is alleged to have been specifically propositioned and invited to perform sexual acts, asked about her body parts and attire, mistreated concerning duties and training, and otherwise

10

generally subjected to suggestive behavior and comments.  Critically, Gadson, was an alleged perpetrator of such conduct during both periods of time, including as her supervisor at Station 6.  (Pl. Dep. at 65; Hawkins Dep. at 53.)  In fact, the record implies that the same kind of conduct began, anew, precisely for Gadson's reinstatment as her supervisor.  *Id.*; (Pl. Dep. at 259).   In this way, the one year's cessation in harassment, which the defendant would like to highlight in defense, actually tends to emphasize the connectedness of the two sets of events.  Harassment was present, when he was.

The defendant also argues summarily that the incidents are dissimilar in substance. (Def. Mem. Supp. Summ. J. at 18.)  Other than to repeat them, the Court does not know how to make the case more clearly.  The incidents are similar in kind; often (although not always) about the plaintiff directly;[2] related to similar bad actors; and whatever proximity issue exists, it tends to bolster, rather than diminish, their relatedness.  The defendant repeats again in reply that the plaintiff "complains of dissimilar actions by Gadson at Station 6, unlike those she claims occurred at Station 5."  (Def. Reply at 8.)  If the defendant means something like, "Gadson did not again try and specifically grab the plaintiff's crotch," then, the defendant has taken a legally preposterous view of what it means for harassing acts to be similar.  The fact that the conduct was done by various employees and merely sexually suggestive, in some instances, and personally derogatory or harassing, in others, does not disqualify it as actionable or related.  *See, e.g., Morgan,* 536 U.S. at 520-21 ("To support his claims of a hostile environment, Morgan presented evidence from a number of other employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets. . . .  we cannot say that they are not part of the same actionable hostile environment claim."); *Johnston v. Leith, Inc.*, 2011 WL 1770434, at *5 (E.D.N.C.  May 9, 2011) ("[P]laintiff has

---

[2]Some incidents may, in fact, not prove an actionable portion of the claim corpus. But, issues of fact exist and the defendant, for its procedural argument, has not challenged really any of the specific pre-December 15 conduct.

alleged conduct by various employees—offensive, sexually suggestive and deragatory statements and actions—that could be motivated by a general hostility towards women in the workplace.") Among the post-December 15 conduct, the plaintiff alleges continued antagonism by Gadson, some concerning her attire and some concerning work-related matters. It is enough. Precisely equivalent lewdness is, mercifully, not required.

The Court, therefore, should consider all of the alleged acts, whether or not they occurred within 300 days prior to the plaintiff's charge of discrimination.

Having concluded that the continuing violation doctrine saves so many of the plaintiff's allegations, the Court would turn now to the application of the elements of the substantive claim. And, while the defendant challenges whether some of them can be satisfied, the Court need not say too much. Insofar as the defendant has argued that all such incidents prior to December 15, 2009 should be disqualified from consideration, it has not actually argued against them with respect to whether they would be sufficient, if considered, to satisfy the severe and pervasive[3] or causation elements of the plaintiff's claim. Maybe it knows that they would. But, regardless, the defendant has not made those arguments and, therefore, has not satisfied its burden to demonstrate that no issues of fact remain as to the evidentiary basis for the third element of the plaintiff's claim, that the harassment must have been either severe or pervasive. The defendant has said some concerning incidents arising after

---

[3]The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir.2003) (en banc). First, the plaintiff must show that he "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998).

In conducting the subjective inquiry the Court need only look at the testimony of the plaintiff. *E.E.O.C. v. R&R Ventures,* 244 F.3d 334, 339 (4th Cir. 2001).

As to the objective severity or pervasiveness of the harassment, it is judged from the perspective of a reasonable person in the plaintiff's position. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81(1998). Whether an environment is objectively hostile or abusive depends on factors such as: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

December 15, 2009.  But, based on the Court's recommendation, those incidents are only a part of the picture.  Much occurred prior to that date, effectively unaddressed by the defendant.  Said more directly, the defendant has only argued that incidents arising after December 15, 2009, fail to be sufficiently severe and pervasive.  It also claims that they were not based upon her gender.   (Def. Mem. Supp. Summ. J. at 19-23; Def. Reply at 8.)  The defendant has not made any such arguments concerning pre-December 15, 2009 conduct.  Accordingly, most of the plaintiff's claim and evidence is unchallenged and summary judgment should be denied.

The Court would say one thing concerning the arguments the defendant does make, as far as they go.  Specifically, the defendant would somehow try and isolate the remarks and conduct of various co-workers and supervisors, post-December 15, even as it concedes some were "crude" and "inappropriate."   For purposes of the severe and pervasive component of her claim, the Court is unaware of any requirement to compartmentalize the various bad acts.  In fact, it seems that the joint contributions of co-workers to a harassing environment may certainly be considered.  *See Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 332-34 (4th Cir. 2003).  Although parsing the source of such conduct might be essential to an analysis of the defendant's liability under element four of the claim, *see id.* at 334-35, the defendant has made no such argument.  Instead it would compartmentalize the conduct of independent actors to diminish the overall view of the environment's severity and pervasiveness.  The Court thinks that this is not what the law would permit.  *See id.* at 332-34.

The defendant has made no other arguments concerning the elements of the plaintiff's sexual harassment claim.  The claim should survive.

## II.    Gender Discrimination

13

The plaintiff has also pled discrimination claims for failure to train and for discriminatory discipline and discharge.

As the Fourth Circuit has explained, the plaintiff may avert the defendant's summary judgment motion and establish her discrimination claims "through two avenues of proof." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (quoting *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (emphasis added). A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race or gender motivated the employer's adverse employment decision. *Diamond*, 416 F.3d at 318. Pursuant to the 1991 Act, the impermissible factor need not have been the sole factor. As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice. *See* 42 U.S.C.A. § 2000e-2(m).

Alternatively, a plaintiff may "proceed under [the McDonnell Douglas ] 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285. The plaintiff attempts to establish her discrimination and retaliation claims using both direct or circumstantial evidence and the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting proof scheme.

Under *McDonnell Douglas*, an employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. If she succeeds, the employer has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture, and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802-05.

14

The Court will address each of the alleged bases of the plaintiff's discrimination gender claim.

### A.    Failure to Train

The plaintiff first contends that she was denied Class E training and certification until April 16, 2010.  The continuing violation doctrine does not save any such alleged denial of training, considered a discrete act of discrimination, prior to December 15, 2009.  *See Morgan*, 536 U.S. at 110-11.  The plaintiff does not seriously argue to the contrary.  She also admits that she, in fact, received the training on April 16, 2010.  (Pl. Dep. at 240.) Accordingly, what the plaintiff is effectively permitted to contend is that she was denied training for 5 months.  Respectfully, this is not a legally cognizable denial.  She was given the training.  The Court would recommend dismissal of the claim on this basis.

That being said, the plaintiff otherwise might have a strong case.  Namely, she has offered direct evidence that the denial was on account of her gender.  Specifically, the plaintiff has submitted evidence that Engineer Kingery, on the date of her training, told her that if she had "just sucked their d----, this would have been a whole lot easier and you would have already been driving." (Pl. Dep. at 416.)  Direct evidence is "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."  *Hill, 354 F.3d at 284-85; Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir.1995) *abrogated in part by Desert Palace, 539 U.S. 90*.  It is evidence that the employer "announced, admitted, or otherwise unmistakably indicated that [the forbidden consideration] was a determining factor . . ."  *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir.1982) (citing *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1113 (4th Cir.)).

The Court would find this comment sufficient to allow the plaintiff to proceed independent of the *McDonnell Douglas* framework for some denial of training over an

15

expanse of time.[4]  But, again, training was provided, as far as the law would permit the evidence to be considered (post-December 15).  The Court can look no farther back.  The plaintiff has not explained or shown evidence that the denial of this specific 5 month's period jeopardized the terms of her employment.  She has submitted evidence that a lack of training, in general, might endanger employment (Pl. Ex. 4 at 10), but nothing concerning Class E training during this time frame, specifically.  That was not the reason for her suspension or termination.

Any claim for discriminatory failure to train should be dismissed.

## B.    Discriminatory Discipline

The plaintiff also contends that she was discriminated against in her suspension, on January 27, 2010, for allegedly making false statements about a doctor's appointment.  She contends that she presented a debit card receipt for the appointment to the defendant but was nonetheless disciplined.  (Pl. Dep. at 223.)

To establish a *prima facie* case of discriminatory discipline, the plaintiff must show: (1) that he is a member of a protected class; (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against her were more severe than those enforced against those other employees. *See Hoyle v. Freightliner, LLC,* 650 F.3d 321, 336 (4th Cir. 2011)*; Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002).  The parties dispute whether issues of fact have been created as to the third element of the plaintiff's *prima facie* case.

---

[4]To establish a prima facie case of discriminatory denial of training, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination. *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 649-50 (4th Cir. 2002).

The plaintiff contends that two male firefighters were disciplined less severely than her for conduct of comparable seriousness.  Specifically, Engineer Kingery[5] was arrested for a DUI while working for the defendant but not terminated,(Ex. 4 at 11-13.) and a Captain David Lombardi was arrested for Criminal Domestic Violence but was also not terminated (Ex. 4 at 13-14.)

To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *See Ward v. City of North Myrtle Beach*, 457 F. Supp. 2d 625, 643 (D.S.C. 2006); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992).

The plaintiff has not offered any of this information.  The Court does not know if Lombardi or Kingery were actually found guilty of either offense.  There is no evidence as to their supervisors.  And, although they were not terminated, the plaintiff has not offered what discipline they, in fact, faced.  The Court thinks there is an even more important distinction, however.

The plaintiff is alleged to have lied to the defendant.  The behavior of Kingery and Lombardi, as far as the Court has been informed, are not acts of dishonesty.  Maybe in an objective moral sense, the Court might agree that a DUI and CDV are somehow more serious offenses, but (1) they were not work related/performed in the course of employment and (2) they did not directly implicate mistrust in the employer/employee relationship.  The conduct is not comparable and the Court disagrees that they can be used as relevant comparators. The plaintiff cannot establish a *prima facie* case of discriminatory discipline.

## C.    Discriminatory Discharge

---

[5]The parties have not provided any first name.

17

To establish a *prima facie* case of discriminatory discharge, the plaintiff must show: (1) that she is a member of a protected class; (2) that she suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action she was performing at a level that met her employer's legitimate expectations; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. *See Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir.2002). The defendant contends that the plaintiff can establish the fourth element of her *prima facie* case.

The plaintiff's employment was apparently terminated, on May 18, 2010, for allegedly being a "major embarrassment" to the defendant by "sleeping, talking on her cell phone, texting, being rude, [and] talking throughout [a training] class." (Ex. 4 at 28:23-30:2; Ex. 12.) The plaintiff claims that two male firefighters engaged in acts of comparable seriousness during the training class. One male firefighter (Firefighter Thomas Barker) left the class at lunchtime and missed three to four afternoons of the class and another male firefighter (Chief Bud Green) missed several days of class. (Pl. Ex. 6 at ¶ 26.)

The problem with the plaintiff's retort, however, is an evidentiary one. *See id.* With regards to these comparators, she only has her own personal affidavit in support. First, that affidavit was not exchanged, in discovery, as required. Second, the plaintiff's subjective view of those individuals conduct is not effective. She has not alleged any decisionmaking responsibility for these individuals. There is no evidence that the defendant was aware of such conduct by them. She does not in any official way establish that either was "kicked out," as she offers. The plaintiff simply lacks the ability to personally speculate about the comparators or their treatment by the defendant. The Court is doubtful that a jury should be permitted to conclude anything from this evidence and that the plaintiff can establish a *prima facie* case based on dissimilar treatment to relevant comparators. The claim cannot survive.

The plaintiff has submitted the statement of a John Bolton, which indicates that he was coerced by Assistant Fire Chief Kyle Minick to write a statement against the plaintiff. (Bolton

18

Aff. ¶ 7.)  This evidence implies a type of falsity or manipulation in the process inconsistent with a legitimate reason for termination, which might be effective to show pretext were a *prima facie* case established. But, it does not imply, of its own, any illegal animus specifically. And, it is never enough for a plaintiff to complain that she was treated badly or wrongly.  She has no recourse as against general meanness or spite or even an actual conspiracy against her, personally.  It is legally permissible for the defendant and/or, specifically, Minick to *dislike* her.   But, to be statutorily actionable, these incidents must be associated with some illegal animus.  And, without a specific comment of the defendant suggesting that gender was, in fact, the reason for her removal, the plaintiff is left only with the luxury that *McDonnel Douglas* affords to establish the possibility of discrimination by implication.   And, that implication requires a *prima facie* case.  Simple credibility issues decoupled from the gender inference that the *prima facie* case is intended to establish are not enough.  *See Hill*, 354 F.3d at 285; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000).  The plaintiff cannot make it out.

**III.    Retaliation**

Lastly, the plaintiff contends that she was retaliated against for having repeatedly made complaints of harassment.  Title VII makes it an "unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he [or she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).  The *McDonnell Douglas* burden shifting scheme, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies in analyzing retaliation claims under Title VII.  *Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir. 2000).  The plaintiff does not attempt to use direct evidence to establish her claim of retaliation.

**A.    *Prima Face* Case**

In order to establish a *prima facie* case of Title VII retaliation, the plaintiff must prove three elements: (1) that she engaged in a protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected

activity and the adverse employment action.  *See EEOC v. Navy Federal Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005); *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004).

Frankly, the factual basis for the plaintiff's claim has not been well presented.  Without offering a time line of dates, she has alleged a shotgun of complaints she made to various individuals about alleged harassment.  (Pl. Resp. at 26.)  The Court has had difficulty determining what the plaintiff contends are the precipitating complaints.  By her own apparent admission, however, it seems that most of those complaints occurred in 2008 and 2009 (Pl. Resp. at 28), too remote from any discipline and discharge in the Spring of 2010, within the actionable period.  The only specifically identified and dated complaint was a memorandum to a Captain Michael Goosen, dated, April 20, 2010.  (Pl. Ex. 17.)  In it, the plaintiff explicitly alleged a hostile work environment.  *Id.*  It appears that the plaintiff may contend that other complaints were made earlier in 2010.  And, those may also be effective.  The Court believes, however, the Goosen letter is enough to continue with this claim.

But, with respect to it, the defendant contends that the plaintiff cannot establish the third element of her claim that any causal connection exists between her complaint to Goosen and the termination of her employment.  But, the Fourth Circuit has held, however, that "very little evidence of a causal connection is required to establish a prima facie case" and "merely the closeness in time between the filing of a discrimination charge and an employer's firing an employee is sufficient" to satisfy the causation element of a prima facie retaliation case. *Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 443 (4th Cir.1998); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir.1989) (holding three month time period between protected activity and termination sufficient to satisfy the causation element of the prima facie case of retaliation); *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) (finding causal link between filing of retaliation complaints and the plaintiff's demotion five months later).  Insofar as the plaintiff's employment was terminated on May 17, 2010, only 27 days after her letter to Goosen, the causal connection is satisfied.

The defendant says very little about the Goosen letter.  In a footnote, the defendant states that the plaintiff has no evidence that Goosen actually received the letter.  (Def. Mem. Supp. Summ. J. at 10 n.34.)  But, the defendant has not submitted evidence that eliminates all possibility that he did not.  In fact, as far as the Court can tell, the defendant has not offered any evidentiary explanation concerning it.  So issues of fact exist as to whether Goosen received it.

The defendant contends further, however, that the plaintiff has not demonstrated that Fire Chief Gregory Bulanow, the individual who terminated the plaintiff's employment, knew about any of the plaintiff's complaints, much less the Goosen letter specifically.  He denies that he did.  But, the plaintiff's letter to a superior, in Captain Goosen, raises the possibility that other decisionmakers might have been aware of it, including Assistant Fire Chief Kyle Minick, who made the report to Bulanow about the plaintiff's behavior in training.  (Def. Ex. J.)  Although Minick also denies any awareness, this is simply an issue of fact.  The presence of a written complaint, made in the chain of command, less than a month before an adverse employment action would seem to satisfy the causal connection demands of the *prima facie* case.

The defendant does not challenge any other element of the plaintiff's *prima facie* case.

### B.    Legitimate, Non-discriminatory Reason

As its non-discriminatory reason for terminating the plaintiff's employment the defendant states that the plaintiff was discharged because of her alleged actions during the training course, in May 2010, and, in light of prior warnings and discipline.  The plaintiff is alleged to have made a rude remark to a guest speaker and talking and/or otherwise used her cell phone during course instruction.  (Def. Ex. J.)

### C.    Pretext

Because the defendant has proffered legitimate, non-discriminatory reasons for its actions, the plaintiff bears the burden of demonstrating that the real reason for the termination was, in fact, an unlawful one.  *See Reeves*, 530 U.S. at 142-43.  As discussed,

21

the plaintiff has produced the statement of John Bolton, which indicates that he was coerced by Minick to write a statement against the plaintiff.  (Bolton Aff. ¶ 7.)   This evidence implies a type of falsity or manipulation in the process inconsistent with a legitimate reason for termination.  And, although Bolton's allegation is insufficient to imply discrimination based on gender for purpose of a discriminatory discharge claim, in the context of a retaliation claim, taken in view of the *prima facie* case, it is enough to submit to jury.

### CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the defendant's motion for summary judgment [Doc. 30] be GRANTED in part and DENIED in part.  Specifically, the defendant's motion should be GRANTED as to the plaintiff's discriminatory failure to train, discipline, and discharge claims.  The motion should be DENIED as to the plaintiff's hostile work environment and retaliation claims.

IT IS SO RECOMMENDED.


s/Bruce H.  Hendricks
United States Magistrate Judge

January 16, 2013
Charleston, South Carolina

22

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).